Good morning, Your Honor. Deanna Dotson representing Emilio Olvera and Mr. Lieberman will be taking half of this argument. I will be covering the denial of the admission of the hearsay statement and Mr. Lieberman will be covering the due process and competition issues. It's the feeling of the Olveras that the court abuses discretion in denying the admission. I'm going to call instead of the full name of the brother-in-law Jorge Salazar-Gillian, I'm just going to call him Jorge for the purposes of this argument. In his plea agreement, he stated that his brother-in-law and sister did not know that the money that he gave to them for the purposes of building their house came from his drug business and he stated that he did lie to them. He told them that it was from his landscaping business. Well, that particular statement was very important to go to the proof in the Olvera's case to show whether or not they had the knowledge and intent in order to form this conspiracy. And so if you can't show where they had the knowledge that the money was from an illegal source and you can't show where they formed an agreement with Jorge in order to launder his drug money, then you have no conspiracy. In fact, in the court's denial of this motion, the court states that you cannot find, for Jorge, you cannot find a conspiracy. It's under Excerpts of Record 105. It said the proffered statements are that defendants Alma Olvera and Emilia Olvera did not know that the money they received from defendant Salazar-Gillian was And so they took the money laundering conspiracy to launder money out of the charge. Well, if you can't have it for Jorge and you can't show there was an agreement, then how can you show that there was an agreement and knowledge for the other two defendants, the Olveras? You can't have it. So you can't have it both ways. But what I would like to show is the fact that his statement should have been admitted, that his statement was trustworthy and should have been admitted under the Hesed Act. How is it inculpatory, though? In other words, he's saying that my sister and her husband didn't know that I was a druggie. But how is that inculpatory of him? That's the first step in getting that in. Well, because he said he did it. He had the drug business. So he was admitting guilt and he was admitting that he did send the money to them. But he was admitting the guilt. They didn't know anything about it. The critical part for them is that they didn't know not what he did, but that they didn't know. And how does saying they didn't know inculpate him? Because he was pleading guilty that he was guilty of the drug charges and he was guilty and an additional charge of money laundering. But that but their state of mind, their state of knowledge about what he did for a living does not inculpate him. No, but he inculpated himself by stating that I am guilty. I had the drug business. We're not meshing here. What the part you wanted in evidence was his statement that they didn't know and that didn't come in. Right. Correct. Okay. How did the statement they didn't know inculpate Salazar? Because in that same sentence or in the same statement that is incorporated into that declaration of his, he also states that he was guilty, that he was doing drugs. He was earning the money from the drugs that he was sending it to them. But they didn't know that it was coming from drugs. But not of conspiracy. It's not a conspiracy. But that the statement that he made that they didn't know exculpated him on charges that there was an agreement. I just don't understand how that inculpated him at all. Well, but further money laundering charges, not a conspiracy now, but money laundering charges were added and forfeiture charges were added. Sure. No question. But it got him off of the charge that he was pleading to at the time. Well, that was only one charge. Yeah, but it got him off that charge. Right. Well, it got him off that charge, but added two additional charges. So it wasn't where he was able to get away from doing something. He was just stating that they didn't know anything about it. So they should not be charged with this because there was no agreement. So that he, you know, and it was up to the jury to be able to make the decision whether or not his he was telling the truth or whether it was just a motive because it was his sister and brother-in-law. And it wasn't up to the court to make that determination. It was up to the jury to make that credibility determination. And that was denied. That right was denied the defendants on this particular issue. There is quite the argument also of insufficiency of the evidence as far as the conspiracy. That's another argument on for both the Olveras. And there was not any evidence presented by the government to show that there was an agreement between Jorge and the two of them to launder this money. There wasn't any showing that there was any knowledge that they knew that this money was being laundered. That this money was from an illegal selling of drugs. They didn't know that. They were under the impression and there was testimony that it came from his landscaping business. And it was perfectly logical that Jorge offered to loan them money to build their house when Mr. Olvera and him were talking about their, he was talking about he was trying to find financing. And he said, well, I'll loan you the money. Well, how much interest will you pay? Will I have to pay you? Oh, you know, you don't have to pay me any interest. You can pay me back later. So it was a loan and it was an understanding that that's the purpose of the money. There was no, you know, evil motive here. There was no illegal agreement in order to take this money and change it into something else and hide it for him. The deposits were open. The withdrawals were open. So there was no evidence presented by the government to show if, in fact, there was a conspiracy involved in here. But the difficulty versus Alma's testimony that she knew that it wasn't a landscaping business, that that was just a front for the books, and that she put different names on some of the money orders that came through. And that's a little damaging, isn't it? Well, could I reserve that argument for Alma's counselors? Of course. Okay. Because I'm not as keyed in. Well, then, specifically with respect to Emilio, he told a lot of kind of different versions of what happened with respect to the money and what accounts he had and this and the other thing. Well, I think there was only one that was brought up, Your Honor, and that was where he could not remember one particular account. And I can't remember which one it was right now. Chartway. Correct. Thank you. He couldn't remember. I couldn't remember. I've got it right here in front of me. But he had been on the stand, I think, for a couple of days and question after question of, did you put money in this bank account? Did you put it in that bank account? And anyone can be confused. Once he was shown, he said, oh, yes, I did. And he acknowledged. He didn't disagree. It's just that for the moment, he couldn't remember which account. And that's understandable. First of all, he was communicating in a second English as a second language. He had an interpreter. But questions were being presented to him in a legal format, in legal terms. And it was very difficult for him to understand sometimes what was being asked and how he should answer the question. So I don't think there was any intent on his part to try and hide, conceal. I think it was honestly, he couldn't remember and he was so overwhelmed. Just like I couldn't remember right now and I have it right in front of me what the name of that bank account was. And it was only the one instance. Everywhere else, he admitted. He admitted, yes, we took the money. Now, there was an argument, too, that it was in money orders or cash. Well, that was very easily explained where he did not know how to write in English. So he didn't have a checking account. He couldn't write checks. So the only way that he negotiated money transactions was either in cash or money orders. His employment checks, he just deposited. He didn't have to write anything. He didn't have to write a check out. Anytime he paid bills, he either took a money order that was written out by the bank or cash. His transactions were all in cash. So that, again, doesn't go to show that he was trying to hide anything. There's no evidence here that he was trying to hide anything. It's just evidence of he was trying to build a home for his family and the means provided by the brother-in-law were there and that's all. He accepted the loan. I'm going to defer the time over to Mr. Lieberman. I'm going to please the court. My name is Steven Lieberman. I represent the appellant Alma Olvera. First, to address questions that were posed by Your Honor in terms of, I believe it was a matter of interpretation of the evidence. I don't believe the evidence actually showed that Alma Olvera admitted this business was a front. There was a conversation indicated about perhaps some of the money being off the books and I think what happened in trial through, I believe it was Agent Pott, he was questioned that being the landscaping business, a lot of these transactions are cash transactions and some of them are done off the books. I think that's the tenor in which that conversation took place. I don't believe there's any actual statement from Alma Olvera where she knew this was a front or she expressed that understanding. I think there was other evidence to show that, in fact, that was a legitimate landscaping business. It may not have produced the type of monies to explain what was forwarded to Ms. Olvera and her husband, but certainly through the government's witnesses, they established that was a legitimate business with its own banking account. There was evidence that he had even had a brochure that was used in the phone book to advertise his services. The various tape recorded conversations also discussed the various landscaping jobs that Mr. Salazar was doing. There was another question posed in terms of how was the statement inculpatory to Mr. Salazar. In our brief, I don't know if I'm pronouncing this name correctly, the United States v. Pagillo case was relied upon. I believe that case is directly on point here. There was a similar scenario in that case. The unavailable declarant was the defendant's father who said he had nothing to do with it, referring to his son, the defendant. And the trustworthiness factor there was somewhat enhanced by the fact that he was the only person who was involved in any of the underlying loan transactions. That may be so, but in terms of the question how is it inculpatory, what the court said in that case is you've got to take the statement in context, because the statement may be on its face as not inculpatory, but if you take it in context by saying he had nothing to do with it, by in this case saying they didn't know I lied to him, in the context is admitting that he is engaged in criminal activity. In the context of the plea call inquiry, I think it's apparent those were just follow-up questions to the ultimate statement, which was inculpatory, that he was in the drug businesses with drug money. They did not know that. I would also like to address, in addition to, even though we believe the statement is admissible as an exception to the hearsay rule, I think there's a bigger question here. And it was raised in the trial court level, and the district court didn't really address it in the written order, and in fact the government has not really addressed it in their answering brief. But that is, despite the fact whether it's admissible as an exception, it goes to the constitutional issue of whether or not Ms. Alvaro was entitled to have that statement put in, the transcribed statement, in order to present her defense. And this goes back to the Supreme Court cases, starting with, I believe, Washington v. Texas, which is cited in our brief, but primarily the Chambers v. Mississippi case. That was a case where the defendant wanted to put in three exculpatory statements from a declarant who was not available on the issue of who was responsible for a particular murder. Likewise, in this case, we wanted to put forward a statement going to the heart of it. The issue of this case was knowledge. Everybody acknowledged that from the very beginning. And it's our position that, as a matter of due process, the statement should have been admitted. What the Chambers case says is that where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice. That case has been cited, too, by Nyserke cases, the United States v. Slaughter, as well as the United States v. Peguio case. They didn't ultimately address it on due process grounds because they found we didn't need to. They thought the statement was admissible as a statement against penal interest. It's our position that in light of the posture of this case, the statement they desired to get came from an individual who was a co-defendant who took exercise of his Fifth Amendment right, which he had the right to do. It's our position, though, that, in effect, the government controlled this witness. The government could have called him as a witness he was obligated to under his plea agreement. If they had done that, he would not have been able to claim a Fifth Amendment right or he would have been in violation of his plea agreement. So, effectively, our position is the government, the control they had over this witness, essentially was keeping exculpatory evidence from the jury that the jury should have been able to hear and make it a credibility determination. In the Peguio case, they addressed that because, in that case, initially, the trial court let in part of the statement, and the court of appeals agreed with the trial court's declaration that, ultimately, a statement from an unavailable declarant, the credibility of it, is going to be a question for the jury. So, it's our position that that was evidence that went to the heart of the Olvera's defense, that they did lack the knowledge, and that evidence should have been presented to the jury. It was a sworn statement from Mr. Salazar and direct questioning from the district court. It's our belief that it's a trustworthy statement. It should have been presented to the jury and let them make the credibility determination. So, we think it's bigger than just an exception to the hearsay rule, even though we agree it was admissible on that grounds. It's a due process matter that's simply, by the government objecting on her hearsay rule, that she was deprived of due process, as stated in the Chambers case, and as observed in the Peguio case and the Slaughter case. So, with that, we reserve the remainder of our time unless you have some questions. All right. May it please the Court. Tom Miller for the United States. Good morning again, Your Honor. Our position as to the United States' position as to Emilio Olvera is simply that the evidence was sufficient to sustain the verdict, that the defendant in that case at trial was caught in an inconsistency in cross-examination. This was the second inconsistency. The first inconsistency was, of course, the statement he gave to the agents in July of 1999 when he met on his porch and told Agent Pa, who was questioning him, also in the presence of a Spanish-speaking interpreter, INS investigator Mel Gray, that he had put $30,000 in the house in two payments, of $18,000 that he had saved in the pocket of a raincoat in the closet, and in the next year he had saved an additional $12,000 and put that into the house, making a total of $30,000 in the house. Of course, the $12,000 he had saved in the year was on the total income, joint income of $24,000 that he and his wife had. Totally ridiculous, I submitted, in argument. He said that there was a $10,000 check that had been provided from his brother-in-law, Jorge Salazar-Guillon's business account, that is his landscaping account. He had simply deposited that $10,000 check into his Bank One joint account, had not used the money, and had returned the money to Mr. Salazar's attorney after Mr. Salazar was arrested in April of 2000. Keith Shigatomi was Mr. Salazar's attorney. Assuming that there is evidence, the jury could believe that Emilio was lying about some things, what was the evidence that he knew the source of the money that he was getting from Salazar, or that his wife was getting? He wasn't overheard on any of these telephone calls. He was not intercepted in any, I do not believe he was intercepted other than in his background, his conversation or his voice in the background, Your Honor. Yeah, but what's the evidence that he knew where the money was coming from? Circumstantial evidence, Your Honor. Based upon what he said about how he handled the money, where he put the money, based upon... People in Houston, Texas who come from the old country don't necessarily put money in banks. They don't trust banks. They don't trust the government. They don't trust any public official. And so putting money in a raincoat pocket is probably an apocryphal story, but it wouldn't be unusual, would it? I don't know. Well, they seem to certainly argue that, Judge, and I can't object to that or I can't take issue with the fact that he did have some money. My problem is that I find all kinds of inferential evidence, I guess, that he knew that Salazar was pretty generous with money, but families do lend each other money to build houses. Then why lie about the ownership? Yeah, but why would he know that it was dirty money? And why lie about the ownership of the house if he didn't know it was dirty money? Why lie about the bank account? Well, did he lie about the ownership of the lot? No, the lot had been purchased some time ago by them, Your Honor. That was illegitimate. There's nothing colorable about the lot. Not when it was purchased, no, Your Honor. The lot was purchased several years prior. But then the house was built on that, the brick house, was built with, what, $30,000? More than that, Judge. I was going to say, it would be a pretty good real estate market if you could get a good brick house in Houston for $30,000. Well, the evidence at trial was that it was largely in a neighborhood where trailer homes were, and it was probably the most expensive home in that neighborhood. But other than the amount of the money and the fact that it came in, some of it in money orders, was there any actual cash that was transported from Salazar to Emilio in cash? Yes. There was testimony that when Salazar came to Texas, he gave them cash. I believe some of the evidence was it was $5,000 on the one account that was given to them when he visited Texas. There is that evidence. That's off the top of my head. It's in the Exhibit 134, I believe, Your Honor. There were cash deposits into the Bank One account more than— Yes. There were transactions that were done during the time frame that were broken up between the banks. There were transactions that occurred at both banks on the same day, and there was some distance between the banks and from where Mr. Olvera lived and where the Olvera household was. And that was part of the— Well, go ahead. I was just curious about tying him in with the guilty knowledge, since he wasn't overheard talking on the phone. That's correct, Your Honor. Just in the background, the cash deposits, there was a $9,000 cash deposit that was made by Alma Olvera at the Bank One on June 2nd of 1994, and I'm looking at Exhibit 134, which is our supplemental excerpt of record, S.E.R., page 93. But that's the only one I can point to, Judge. I don't see the cash transactions that exceed $10,000. My question was bothering me a little bit about Bennett's testimony that Salazar drove an expensive car and he didn't have any gardening tools in it and so forth to pick up the truck. What is the evidence that the Olveras were privy to all this at a critical time, that they knew that he drove a big car, but there were no tools in it? Was there evidence that they had visited him? No. The testimony was she had never been to Hawaii. Alma had never been to Hawaii, and I believe it was the same with the husband. I think he said he had never been to Hawaii. But the testimony on the wiretap was inconsistent with, and I believe you pointed out, Your Honor, that there was inconsistency or there was testimony that she knew, Alma knew, that the money that came in was just put on the books as a front, and that's in the one call on page 20. Well, it could have been a front to avoid paying income tax, couldn't it? It wouldn't necessarily have a drug connection. That could be. That could be. I mean, there are a lot of people who do business with cash and just don't eagerly volunteer to account for it. To account for all the gross income? I agree. I see that many times. But I think the jury had the opportunity, of course, to view the defendants, view their credibility, examine their story or their version of whose house it was. From day one on these conversations, Alma has talked about it has been, it is his house. When are you going to sell your house? The census people came by and brought the form for you because you're the owner of the home. When Emilio Vera was questioned on his porch, he said it was his house. He had built the house without any help from anyone else because he'd sent the $10,000 back to Mr. Salazar's attorney, that it was $30,000 they put in the house, and that was then admitted on cross-examination. Well, admitted, actually, inconsistency was on direct examination with his own attorney where he said, well, I put $50,000 in the house that I got from Jorge Salazar. That's about what I got. That was his direct examination. On cross-examination, he admitted there was another account and gave this story that, oh, I forgot about that account. I closed it years ago. I closed it years ago only when I worked at the airport, and I don't even remember the name of the account when I asked him. Then when I put the withdrawal slip in his hand, yes, all right, okay, I did have an account, Chartway Federal Credit Union, and it was open through 1999, two years previous to that. The money that went in there was from Mr. Jorge Salazar, $26,000, and that money was traced. Actually, $15,000 of that was traced also into the construction of the house. So it's well over the $50,000, well over the $30,000 out of his own pocket that he admitted that he claimed on his porch step that it was only his money that went into the account. They got caught in lie after lie after lie, inconsistencies. When no one was listening, when the wiretap was on, and they didn't think anybody else was around, they talked about the true owner of the house. And I think that's, I submit, that's what certainly hurt Ms. Olvera. As to Emilio Olvera, he could never get it straight, whose house it was, how he financed the house. Even his own attorney admitted in closing that his testimony was not helpful. If the Court has other questions. I see I have some time left. You're generously willing it to Mr. Hudson? I've been up here enough this week, Judge. Okay. Thank you. Thank you. I'm only going to take part of the time and leave part. On the inconsistencies, I don't think the inconsistencies are really there because, again, I think you have to look at the language barrier. And even though Agent Pa got up and stated that they interviewed him in his home and he said this, and I even had Agent Gray who could speak Spanish. Well, when Emilio was on the stand and asked that same question, he said, well, his Spanish is about as good as my English, and if you read the transcript, his English is not very good at all. And so, therefore, anyone that speaks another language can know that words can be, you know, a word has a different meaning if you don't say it correctly. So just because they said that the information was given and it was this and it wasn't that, I think you have to take that with a grain of salt as what language were they speaking. Another thing about there was no evidence as to the knowledge of whether or not particularly Emilio Olvera, if he knew where this money was coming from. He thought it was from a legitimate landscaping business. There was nothing in his testimony, there was no evidence presented by the government to show that anything other than the fact that he thought it came from legitimate funds. Also, I don't believe that Mr. Olvera Emilio ever lied about the ownership of the house because he always maintained that it was his house, he was building it. However, his brother-in-law, Jorge, is the one that loaned him the money, and, therefore, by loaning him the money, he had an interest in the home, and I believe that would be Alma's interpretation of it also. Well, it's our house, however, it's with your money that we're building this house, so really, in essence, you can't own the house, too, because that's in reality. The banks own the house. We aren't the true owners. When we have a mortgage, they are the really owners. We're not. However, we consider ourselves owners. So I don't think there was any really intent to hide or intent to show who the true ownership of the house was. And I'll leave that. There was not enough evidence to convict him on the conspiracy, and I'll turn the time over to the co-counsel. Okay. Mr. Lieberman? Very briefly. On the issue of whether or not the Olvera, primarily Ms. Olvera, who I speak for, had knowledge of the source of this money, I cite the Court to the cases in my brief, United States v. Messer and United States v. McDougall. Those are both cases where allegations of money laundering involving proceeds from drug activity, and what the courts talk about is it takes more than suspicion and speculation. And that's what the government presented in this case. Yeah, the government did a great job cross-examining these two people, who I grant are not very sophisticated people, not educated in this country. That was very apparent. But they simply did not bring forth the evidence to show that this was drug money. And the Messer case and the McDougall case speak to that, what needs to be shown to get over that hump. And it's our position they did not. McDougall is a Sixth Circuit case. Sixth Circuit, that's correct, Your Honor. Is there anything from our court? It's a Messer case, Your Honor. It's a Messer case. On that point, that knowing the money might be a little bit dirty, but not knowing that it's drug money. I mean, there are people who make money dishonestly by other means, such as stock market manipulation or energy contracts that produce enormous quantities of money, but not drug money. That's correct. It's our position, Your Honor, that the case was indicted specifically and the jury was charged that the money was proceeds from drug activity. And it's our belief that the government needed to establish that, which they did not. As far as answering briefly another question that was posed, the Olveras had never been to Hawaii. The evidence showed that Mr. Salazar, ever since coming to the United States, had been in the landscaping business. That was not disputed. He was in the landscaping business in San Antonio. No, there's no argument about that. I do have a question about Alma. The judge found that she was lying on the stand. Now, there may be a question about whether the judge crossed all the T's and dotted all the I's in making the finding for the enhanced sentence. But what is the innocent explanation for her perjury, if it was perjury? The explanation is, Your Honor, that she testified. It was her belief the money came from his landscaping business. And I believe the evidence that was offered at trial well before she even testified backed that up, that he was in the landscaping business. The government's agents verified that. Whether or not, like I said, it produced the monies that were involved. But even the tape recording conversations reflect that there were discussions about his landscaping business. It was our position on that issue, just because she's found guilty, that alone is not enough to get the obstruction of justice enhancement. And we don't believe the trial court made sufficient findings to show that, in fact, those statements were willful attempts as opposed to mistaken beliefs based on statements made to her by her brother. And that's all I have. Thank you. All right. Counsel, thank you for your argument. The matter just argued will be submitted, and the court will be in recess. Thank you. Thank you. Thank you. Thank you.
judges: Goodwin, Rymer, Tg Nelson